DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | CASE NO. 1:12 CR 238 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| Douglas L. Wright, | ) | |
| Brandon L. Baxter and | ) | |
| Connor C. Stevens, | ) | |
| | ) | |
| Defendants. | | |

### I.  Introduction

The three defendants, Wright, Baxter and Stevens, entered pleas of guilty on Wednesday, September 5, 2012 to the three-count Indictment in this case[1] and are awaiting sentencing.

Counts 1 and 2 charge violations of Title 18 U.S.C. § 2332a(a)(2)(B) and (D) as follows:

Count 1
The Grand Jury charges that:

From on or about February 20, 2012 to on or about April 30, 2012, in the Northern District of Ohio, Eastern Division, the defendants, Douglas L. Wright, Brandon L. Baxter, Anthony Hayne, Connor C. Stevens and Joshua Stafford, acting without lawful authority, did knowingly conspire to use a weapon of mass destruction, specifically, a destructive device composed of two Improved Explosive Devices (IEDs) containing C-4 plastic explosives, against property within the United States used in interstate commerce or in an activity that affects interstate commerce, namely the Brecksville-Northfield High Level Bridge, and the offense and the results of the offense would have affected interstate commerce.

---

[1] The transcripts of the three guilty pleas are found at ECF 156, 157 and 158.

(1:12 CR 238)

      All in violation of Title 18, United States Code, Sections 2332a(a)(2)(B) and (D).

Count 2

      The Grand Jury further charges that:

      On or about April 30, 2012, in the Northern District of Ohio, Eastern Division, the defendants, Douglas L. Wright, Brandon L. Baxter, Anthony Hayne, Connor C. Stevens and Joshua Stafford, acting without lawful authority, did knowingly attempt to use a weapon of mass destruction, specifically, a destructive device composed of two Improvised Explosive Devices (IEDs) containing C-4 plastic explosives, against property within the United States used in interstate commerce or in any activity that affects interstate commerce, namely the Brecksville-Northfield High Level Bridge, and the offense and the results of the offense would have affected interstate commerce.

      All in violation of Title 18, United States Code, Sections 2332a(a)(2)(B) and (D), and 2.

Count 3 of the Indictment charges a violation of 18 U.S.C. §§ 844(i) and 2.  The text to

Count 3 follows:

Count 3

      The Grand Jury further charges that:

      On or about April 30, 2012, in the Northern District of Ohio, Eastern Division, the defendants, Douglas L. Wright, Brandon L. Baxter, Anthony Hayne, Connor C. Stevens, and Joshua Stafford, maliciously attempted to damage and destroy, by means of explosives, specifically, two Improvised Explosive Devices (IEDs) containing C-4 plastic explosives, real property used in interstate commerce, specifically the Brecksville-Northfield High Level Bridge, and aided and abetted each other to do the same.

      All in violation of Title 18, United States Code, Sections 844(i) and 2.

2

(1:12 CR 238)

The relevant text of 18 U.S.C. § 2332a(a)(2)(B) and (D) provides as follows:

> **(a) Offense against a national of the United States or within the United States.**–A person who, without lawful authority, uses, threatens or attempts or conspires to use, a weapon of mass destruction--
>
>> (1) against a national of the United States while such national is outside of the United States;
>> (2) against any person or property within the United States, and
>
> . . .
> (B) such property is used in interstate or foreign commerce or in any activity that affects interstate or foreign commerce.
> . . .
> (D) the offense, or the results of the offense, affect interstate or foreign commerce, or, in the case of a threat, attempt, or conspiracy, would have affected interstate or foreign commerce;
>
> (c) Definitions.--For purposes of this section--
>> . . .
>> (2) the term "weapon of mass destruction" means--
>
> (A) Any destructive device as defined in Section 921 of this title;
> . . .

The relevant text of 18 U.S.C. § 921 provides as follows:

> § 921.  Definitions
>
> (a) As used in this chapter--
> . . .
> (4) The term "destructive device" means--
>
> (A) any explosive, incendiary, or poison gas--
>
>> (i) bomb,
>>
>> . . .

3

(1:12 CR 238)

## II.  The Factual Basis Set Forth In The Transcripts of the Guilty Pleas

During the change of plea hearing with respect to the three defendants, Wright, Baxter and Stevens, the following statement of facts was presented in open court to each of the three defendants and which they acknowledged to be true.

The identical statement of facts as presented to each of the three defendants during the change of plea hearing on September 5, 2012 follows:

> Change of Plea Hearing as to defendant Brandon L. Baxter
> ECF 156, page 9, line 12 to page 11, line 21.

> THE COURT: Now, let me read it to you, because after I'm done reading it to you, I am going to ask if you find any fault with those proposed statement facts.

> "Number 1, from on or about February 20, 2012 to on or about April 30, 2012, in the Northern district of Ohio, Eastern Division, the defendant, Brandon L. Baxter, conspired with others, including but not limited to Douglas L. Wright, Joshua Stafford, and Connor C. Stevens by engaging in conversations about using explosive devices against government property.

> 2, the discussions Brandon L. Baxter had with Douglas L. Wright, Joshua Stafford, and Connor C. Stevens and others eventually led to conversations about planning to use, and in fact, acquiring a weapon of mass destruction, specifically, a destructive device composed of two Improvised Explosive Devices (IEDs) containing C-4 plastic explosives, against property within the United States used in interstate commerce or in an activity that affects interstate commerce, namely the Brecksville-Northfield High Level Bridge.

> 3, because the Brecksville-Northfield High Level Bridge is a state highway, the offense and the results of the offense would have affected interstate commerce.

> 4, based on these plans and conversations, on or about April 30, 2012, in the Northern District of Ohio, Eastern Division, the defendant, Brandon L. Baxter and others, including but not limited

4

(1:12 CR 238)

to Douglas L. Wright, Joshua Stafford, and Connor C. Stevens placed a destructive device composed of two Improvised Explosive Devices (IEDs) containing C-4 plastic explosives at the base of the Brecksville-Northfield High Level Bridge.

Number 5, Brandon L. Baxter and others, including but not limited to Douglas L. Wright, Joshua Stafford, and Connor C. Stevens, then attempted to detonate the devices from a remote location.

6, on or about April 30, 2012, in the Northern District of Ohio, Eastern Division, the defendant, Brandon L. Baxter, and others, including but not limited to Douglas L. Wright, Joshua Stafford, and Connor C. Stevens maliciously attempted to damage or destroy, by means of explosives, specifically, two Improvised Explosive Devices (IEDs) containing C-4 plastic explosives, real property used in interstate commerce, specifically the Brecksville-Northfield High Level Bridge, and aided and abetted each other to do the same.

7, at no time did the defendant, Brandon L. Baxter, have lawful permission or authority to possess or use explosive devices or weapons of mass destruction.

8, defendant acknowledges that the above summary of defendant's conduct does not set forth each and every fact that the United States Attorney's Office could prove at trial, nor does it encompass all of the acts which defendant committed in furtherance of the offenses to which defendant is pleading guilty."

Now do you find any fault with that proposed statement of facts as far as you're concerned?

THE DEFENDANT: No

THE COURT: The court finds there's a factual basis to support a plea of guilty to the three counts in the indictment.

The other two defendants, Douglas L. Wright and Connor C. Stevens, were engaged in a similar dialogue with the Court and acknowledged the truthfulness of the factual basis as above described.

5

(1:12 CR 238)

### III.  The Testimony of the Co-Defendant Anthony Hayne

During the hearing conducted by the Court on November 5 and November 6, 2012, the government presented the testimony of the co-defendant Anthony Hayne, who indicated that he first met the CHS the day before the commission of the crime and he was introduced to the CHS by co-defendant Douglas Wright.  Hayne further testified that he met Douglas Wright in late October of the previous year and during that time, the defendant Douglas Wright brought up the topic of explosives.  Later, Hayne was present when the issue of obtaining explosives was discussed with Wright, Baxter and Stevens, but that the CHS was not present.  Later, the following testimony was presented:[2]

> Q.  Okay.  Did Doug Wright discuss with you any plans for violence?
>
> A.  Other than the – I'm sorry?
>
> Q.  Do you recall any other conversations he had?
>
> A.  I mean, April 29 and April 30.
>
> Q.  Okay.  What were those plans about?
>
> A.  Blowing up a bridge.
>
> Q.  Okay.  And what was used to blow up that bridge?
>
> A.  C-4.
>
> Q.  And who got the C-4?
>
> A.  We did.  Me and Douglas Wright, Brandon Baxter and the CHS.

---

[2] Case No. 1:12 CR 238, ECF 179, pp. 198-200.

6

(1:12 CR 238)

Q.  Okay.  Now, on April 30, what happened that evening?

A.  We drove out to the location.  Douglas Wright, Connor Stevens, Joshua Stafford planted the explosives by the bridge.

Q.  What was your role?

A.  I was a lookout.

Q.  Were you looking out for – to make sure your friends didn't get caught or were looking out to keep people away?

     MR. GILBERT:  Objection.

BY MR. BROWN:

Q.  Who told you about the plan to blow up the bridge?

     MR. VEGH:  Objection

     THE COURT:  Overruled.

     THE WITNESS:  Douglas Wright.

BY MR. BROWN:

Q.  Did the CHS?

A.  No.

Q.  And were you told what purpose blowing up the bridge was going to serve?

A.  Yes.

Q.  What purpose?

A.  Stop the transportation of the 1 percent.

7

(1:12 CR 238)

Later, the Court questioned Hayne as follows:[3]

THE COURT:  I have some questions.

MR. BROWN:  Sure.

THE COURT:  Tell me again when did you first become associated with the other defendants?

THE WITNESS:  It was late October of last year.

THE COURT:  Under what circumstances?

THE WITNESS:  It was through Occupy Cleveland.

THE COURT:  Who was the first person that you eventually joined the group, so to speak?

THE WITNESS:  It was just a bunch of people, yes.

THE COURT:  And who talked to you about being a part of the group?

THE WITNESS:  [I]t was pretty much unsaid.

THE COURT:  Okay.  Who was – who was a part of the group that eventually was trying to blow up the bridge?  Who was part of the group?

THE WITNESS:  It was me, Douglas Wright, Connor Stevens, Joshua Stafford, Brandon Baxter.

THE COURT:  All right.  And when did you – when was the discussion - do you recall when the discussion first took place about going down to the bridge with explosives?

THE WITNESS:  April 29.

THE COURT:  The day before?

---

[3] Case No. 1:12 CR 238, ECF 179, pp. 207-11.

8

(1:12 CR 238)

THE WITNESS:  Yes.

THE COURT:  All right.  Who raised the question of using explosives?  Who was the person that said, "We're going to go down there and use explosives at the bridge."

THE WITNESS:  Douglas Wright.

THE COURT:  All right.  Do you know where they got the explosives?

THE WITNESS:  Yes.

THE COURT:  Where?

THE WITNESS:  At a hotel from what I ended up finding out to be an undercover agent.

THE COURT:  All right.  Were you there when you got the explosives?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Who else was there?

THE WITNESS:  It was me, Douglas Wright, Brandon Baxter and the CHS.

THE COURT:  What were you told about the explosives, what power they had or what they'd accomplish?

THE WITNESS:  I wasn't really told what the power, as far as what they were do or anything like that.  The tutorial we got was just basically how to use them.

THE COURT:  All right.  And how were you told how to use them?

THE WITNESS:  The agent pretty much described it to us, took it step by step all the way.

THE COURT:  Who described it?

9

(1:12 CR 238)

THE WITNESS:  It ended being an undercover FBI agent.

THE COURT:  Okay.  He's the one that in effect made the explosives possible?

THE WITNESS:  Yes.

THE COURT:  He told you how to use it?

THE WITNESS:  Yes,  Your Honor.

THE COURT:  It was not the CHS.  It was the undercover officer.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Explain, as you recall, what kind of instructions did he give you about how to use the explosives?

THE WITNESS:  Basically it was a toggle switch on the inside of the box to turn that on, turn the cell phones on that were inside of the boxes and to – I think it was to text a certain number to the phone and the devices would explode.

THE COURT:  And I gather the plan was the plant to explosives and then leave and set it off at a later place?

THE WITNESS:  Yes, your Honor.

THE COURT:  Were you there when you tried to set off the bomb?

THE WITNESS:  Yes, Your Honor.

THE COURT:  And who was there with you at that time?

THE WITNESS:  Me, Douglas Wright, Connor Stevens, Brandon Baxter, Joshua Stafford and the CHS.

10

(1:12 CR 238)


IV.  The Court's Summary of the Offense Conduct

There has been some dispute with respect to the summary of the offense conduct.  After reviewing the presentence report and the government's description of the offense conduct, the Court summarizes the offense conduct as follows:

On October 6, 2011, the leaders of the Occupy Cleveland Movement got a permit for the City of Cleveland to camp out in tents and have their meetings on the northwest quadrant of Public Square.  The city would not renew the permit beyond October 21, 2011.  The Occupy people planned to have a symbolic protest on October 21, 2011.  There were some dissenters among Occupy people who wanted a more vigorous resistance to police, including the defendants Brandon Baxter and Douglas Wright.  However, when the passive plan was implemented, both the defendants Baxter and Wright joined the others in the non-violent approach.

The FBI sent a paid informant to the October 21, 2011 protest at Public Square.  It was here the informant, aka CHS, encountered defendant Douglas Wright.[4]

The Occupy Movement did not end on October 21, 2011.  Instead, Occupy people were allowed to maintain one tent on Public Square and to occupy that tent 24 hours a day.  Some of the Occupy people, including the defendants Douglas Wright, Brandon Baxter, Connor Stevens

---

[4] The description of the offense conduct occasionally refers to the CHS as an informant. For the remainder of the summary, the Court will use only the initials "CHS" to refer to the cooperating individual who recorded conversations with the defendants and obviously facilitated the criminal conduct of the defendants, but did not entrap the defendants.

11

(1:12 CR 238)

and Anthony Hayne briefly moved into an abandoned church after October 21st.

During this time, Douglas Wright talked openly with the CHS of doing something more than traditional protesting and about his fascination with the idea of pulling pranks by using spray paint, stink bombs and smoke bombs which he heard about in the Anarchist's Cookbook.

In November 2011, defendants Wright and Baxter met the CHS and talked about wanting to do more than what the Occupy people were doing.  The CHS said he could pay for the activities and offered the two jobs.  Because there was no work to do, contact was lost until February 2012.

On February 15, 2012, the CHS met with defendant Wright to inquire about the Occupy Movement.  Wright advised about a protest in May in Chicago and that Wright wanted to get protective riot gear in the event that police would try to violently break up the protest.  According to Wright, the CHS gave Wright $200 and they agreed to set up a future appointment.

On February 20, 2012, the CHS, Wright and Baxter went to a restaurant for lunch in Lakewood, Ohio.  During the lunch, several potential targets were discussed including a hospital or bank using stink bombs, explosives and/or paint guns.  Wright and Baxter also discussed doing some kind of attack during the opening of the new casino in Cleveland.  The group also went on to discuss the G-8 conference in Chicago and the Republican Convention in Tampa.

On March 28, 2012, the CHS again met with Wright and Baxter.  During this meeting, discussion turned to blowing up a bridge as the group drove over a bridge in Valley View, Ohio.  The conversation then turned to blowing up a bridge in the corporate district of downtown Cleveland and that blowing the bridge up would cause a lot of financial damage.  They also

12

(1:12 CR 238)

discussed how taking out a bridge would lead to the government having to put security on every

bridge in the country.  The "Detroit" bridge was identified as a potential target by Wright

because it connects downtown Cleveland and Ohio City.  Wright and Baxter later said they did

not want people to think they were terrorists so they would want to blow up the bridge at night or

possibly pretend to be a construction crew and drop orange cones off at the end of each bridge to

stop traffic before blowing up the bridge, thus limiting the number of casualties and the potential

for killing possible supporters.

The CHS and defendants Wright, Stevens and Baxter met on several occasions through

April 1, 2012, although the defendant Stevens was not present for all of the meetings.  During

these meetings the idea of obtaining C-4 explosives was brought up on several occasions.

Initially, defendants Wright and Baxter declined to purchase the C-4.  However, on April 1,

2012, Wright agreed to purchase the C-4 in a meeting with the informant and an undercover

agent.  Wright further stated that he would sell marijuana to get the money to pay for the

explosives.

Once the decision was made to buy the explosives, talk then turned to where to set off the

explosives.  A few possible locations were identified before talk turned to the Route 82 bridge.

On April 7, 2012, Wright, Baxter, Stevens and the CHS had a lengthy discussion about

violent acts and riots with Wright wanting to find a way to use the C-4.  During the discussion

Baxter discussed shutting down downtown Cleveland for the day with the goal of the strike to

stop as much money flow to corporate America which will stop business from being conducted

in downtown Cleveland.  Discussion then turned to taking out the Turning Bridge in the Flats.

13

(1:12 CR 238)

Talk then turned to strapping C-4 explosives to an armored car and blowing a chunk out of the Federal Reserve.  The group then discussed studying the Fusion Center's hours of operation and finding out when no one is actually working there.  The group then discussed that the Fusion Center is located on the ninth floor of the Justice Center.  The group then discussed blowing up the Justice Center with Wright wearing  a suicide vest bomb.  However, Wright then decided against blowing up the Justice Center.

Later in the planning process, the group directed their conversation towards blowing up a ship in the Cuyahoga River before eventually agreeing on the Northfield-Brecksville Bridge as a target.

On April 29, 2012, the CHS picked up defendants Wright, Hayne and Baxter and took them to a motel where an undercover FBI agent delivered two inert C-4 explosives.  The FBI agent informed them how to arm and detonate the C-4.  The FBI agent also delivered ballistic vests, smoke grenades and gas masks which had been ordered by Wright and Baxter.

On April 30, 2012, defendants Wright, Stevens, Hayne, Stafford and Baxter placed the two inert C-4 explosives at the base of a support column of the Northfield-Brecksville High Level Bridge, a structure used in interstate commerce.[5]  The defendants then drove to a location from where they were not able to see the bridge and repeatedly attempted to detonate the devices.  They were subsequently arrested.

---

[5] During the detention hearing, a film was played for the Court demonstrating the placement of the inert C-4 explosives at the base of the support column of the bridge by the defendants.

14

(1:12 CR 238)

The following information was abstracted from a report written by Steven Oluic, a bomb

expert and defense expert consultant who examined the IEDs and the location of where the IEDs

were placed on the night of the instant offense.  In his report, he described the composition of the

two IEDs, his estimation of the potential damage from them and what he believes would be

needed to take down the Northfield-Brecksville High Level Bridge.

> "Each is nearly identical in nature; each has one cell phone
> connected with wiring to an electric ignition switch that is further
> connected to an electric blasting cap.  The C4 blocks and electric
> blasting caps are inert.  Each device is composed of 2 x 2 (total of
> four) blocks of C4, M112 blocks, tapped together with black
> electric tape.  The charges are very accurate depictions of military
> Composition C4 charges.  The total weight of explosive per device
> is five pounds.  Each assembly is housed in a black plastic
> container with a securable lid bearing the name brand "Task
> Force" in red on one side.  Each is an accurate replica of an actual
> device assembled from real explosive materials.
>
> "Any explosion with the amount of explosives provided may have
> caused minor damage to the pier walls, such as spalling; the shock
> wave of the detonation shattering some concrete away at the
> surface directly next to the blast.  The devices were not attached to
> the foundations, nor were they tamped with sandbags or earth to
> confine the charge at the target material.  Furthermore, as seen in
> the surveillance video, the two devices were placed on the ground,
> the length of the boxes placed parallel to the pier wall, at the center
> of each pier.  To breach or severely damage the two foundation
> structures, which are reinforced concrete, based on where the
> devices were located, would require well in excess of 1487.5
> blocks of Composition C-4 at each structure ... While military
> demolition planning factors, ... only lists a target thickness to a
> maximum of eight feet, I estimated 2.5 times the amount listed (2.5
> x 595 packages of C4) for an eight foot thick structure.  This is a
> simple extrapolation based on the amount of explosive needed for
> an eight foot structure to a 20 foot think concrete structure.
> Considering military charge calculation tables, I estimate a
> minimum of blocks of 2,975 blocks of Composition C4; this is
> 3718.75 pounds or almost 100 boxes of C4 blocks."

15

(1:12 CR 238)

Although by his expert estimation there would have been minor damage had there been an actual detonation, this information is being provided to the Court for use in considering the appropriate sentencing factors.

<u>V.  The Applicable Guidelines Manual Provisions Respecting Terrorism</u>

§ 3A1.4.        Terrorism

(a)        If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by **12** levels; but if the resulting offense level is less than level **32**, increase to level **32.**

(b)        In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

<u>Commentary</u>

<u>Application Notes</u>:

1.        <u>"Federal Crime of Terrorism" Defined</u>. – For purposes of this guideline, "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5).

. . .

3.        <u>Computation of Criminal History Category.</u>  – Under subsection (b), if the defendant's criminal history category as determined under Chapter Four (Criminal History and Criminal Livelihood) is less than Category VI, it shall be increased to Category VI.

(1:12 CR 238)

### VI.  Summary of Judicial Decisions Relating to the "Terrorism Enhancement"

The unpublished opinion for the Sixth Circuit by the Chief Judge of our court, sitting by designation with the Sixth Circuit, in *U.S. v. Assi*, 428 Fed. Appx. 570, 572-73 (6th Cir. 2011) is instructive.  In writing for the court, Judge Oliver opined that there are only two elements that must be met in order for an offense to be a federal crime of terrorism and neither of those elements requires an act to be violent.

The first element discussed by Judge Oliver, citing 18 U.S.C. § 2332b(g)(5)(A), is that the offense must be intended "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."   The second element is that the offense must involve a violation of one of the crimes enumerated in 18 U.S.C. § 2332b(g)(5)(B).

The case of *U.S. v. Graham*, 275 F.3d 490 (6th Cir. 2001) is described by the Sixth Circuit as a case of first impression.  The defendants were members of a militia group called the Michigan Militia Wolverines and the purpose of the group was to prepare for a "war" with the government and ultimately to overthrow the government.  The issue of first impression was when a district court may apply U.S.S.G. § 3A1.4, the domestic terrorism enhancement to a defendant's sentence.

In its opinion, the Sixth Court stated:[6]

> Application note 1 to the Guidelines instructs us that a "Federal crime of terrorism" is defined at 18 U.S.C. § 2332b(g).  Turning to the statute, the term "Federal crime of terrorism" is defined in the conjunctive: it is "an offense that is calculated to influence or affect the conduct of government by intimidation or coercion, or to

---

[6] *Graham*, 275 F.3d at 514.

17

(1:12 CR 238)

retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A), *and* is a violation of one of the enumerated statutory provisions provided in § 2332(g)(5)(B).  Graham argues that the district court improperly applied the adjustment because he did not commit a "Federal crime of terrorism" as defined by the statute.

After considerable discussion, the Sixth Circuit concluded as follows:[7]

Based on our review of the record, we cannot say that the district court's findings of fact are clearly erroneous.  Witness testimony established that Graham or his co-conspirators targeted these places for attack.  Moreover, there is no dispute that the targets mentioned by the district court and the acts attributable to Graham were within the scope of the conspiracy and were reasonably foreseeable to the defendant.  Given our review of the trial record, the district court's determination that the defendant's § 371 conspiracy was "intended to promote" a federal crime of terrorism, in particular the crime of maliciously damaging or destroying, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce, was not error.  Therefore, we **AFFIRM** the district court's adjustment of Graham's sentence under § 3A1.4.

The decision in *U.S. v. Hale*, 448 F.3d 971 (7th Cir. 2006) bears consideration.  The

defendant was convicted of obstruction of justice and soliciting a crime of violence in connection

with his involvement in a plot to have a federal district court judge murdered for entering a civil

judgment against his white supremacist organization.  In its lengthy opinion at page 988, the

Seventh Circuit opined:

Finally, Hale challenges his overall 480-month sentence on several grounds.  We may quickly dispose of his argument regarding the application of U.S.S.G. § 3A1.4, the terrorism adjustment.  Relying on *United States v. Arnaout*, 282 F.Supp. 2d 838 (N.D.Ill. 2003), Hale argues that § 3A1.4 cannot apply because he was not

---

[7] *Graham*, 275 F.3d at 518-19.

18

(1:12 CR 238)

convicted of a "federal crime of terrorism."  Our decision on appeal in that case forecloses his argument.  We held that § 3A1.4 applies "where a defendant is convicted of a federal crime of terrorism as defined by [18 U.S.C.] § 2332b(g)(5)(B) *or where* the district court finds that the purpose or intent of defendant's substantive offense of conviction or relevant conduct was to promote a federal crime of terrorism as defined by §2332b(g)(5)(B)."  *United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005) (emphasis added); *accord United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004); *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001).  That Hale did not commit a federal crime of terrorism is irrelevant; the district court found that the purpose of his soliciting Evola was *to promote* a federal crime of terrorism – the murder of a federal officer or employee.  Hale does not argue that the court's factual finding is clearly erroneous, so the adjustment applies.

Also of consequence is footnote 1 in the *Hale* opinion, also at page 988, which states:

Under 18 U.S.C. § 2332b(g)(5)(B), a "federal crime of terrorism" is defined as a listed offense that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.  The enumerated crimes include 18 U.S.C. § 1114, the murder or attempted murder of officers and employees of the United States.  The definition of "federal crime of terrorism" appears within a statutory section entitled "Acts of terrorism transcending national boundaries," *see* § 2332b, and some of the cases cited above involve international terrorism, but the 1996 and 1997 amendments to the sentencing guidelines removed any requirement that *international* terrorism be implicated by the offense of conviction; the guidelines simply borrow the statutory definition from § 2332b(g)(5)(B).  *See Graham*, 275 F.3d at 497-98 (enhancement applied to member of domestic militia involved in plot to forcibly overthrow the government); *United States v. Nichols*, 169 F.3d 1255, 1270 n. 5 (10th Cir. 1999) (explaining that § 3A1.4 would apply to Terry Nichols, convicted for his role in the bombing of the Alfred P. Murrah building in Oklahoma City, but for *ex post facto* considerations).

19

(1:12 CR 238)

In the case of *U.S. v. Jordi*, 418 F.3d 1212 (11th Cir. 2005), the government appealed the district court's denial of its request for an upward departure pursuant to U.S.S.G. § 3A1.4. The district court declined to apply the terrorism enhancement because it concluded that the government had failed to demonstrate that the defendant's crime, *i.e.,* to destroy abortion clinics using explosive devices, transcended national boundaries, which was required for consideration of an upward departure.  The Eleventh Circuit reversed, holding that the phrase regarding "transcending national boundaries" did not apply, and remanded for re-sentencing.

The 2009 decision in *U.S. v. Christianson*, 586 F.3d 532 (7th Cir. 2009) provides further guidance.  In this consolidated appeal, defendants Christianson and Rivera were members of the Earth Liberation Front, identified by the FBI as a domestic eco-terrorist group.  The defendants were indicted for and pleaded guilty to destroying 500 trees that were part of an experimental study.  The district court found that the defendants' crime was among those listed in the terrorism enhancement under U.S.S.G. § 3A1.4 and that the defendants committed those acts to influence or affect the conduct of the government by intimidation or coercion, and consequently applied the terrorism enhancement.  For defendant Christianson, the terrorism enhancement raised her offense level to 29, with acceptance of responsibility, and her criminal history category to Category VI.  Christianson's guideline range was then calculated at 151 to 188 months.  After consulting the factors at 18 U.S.C. § 3553, the district court sentenced Christianson to 24 months in prison.  Defendant Rivera had the same guideline range as Christianson - 151 to 188 months.  Noting his lack of an apology or regret, the district court sentenced Rivera to 36 months imprisonment.  *Christianson*, 586 F.3d at 536.

20

(1:12 CR 238)

On appeal, both Christianson and Rivera challenged the district court's loss findings.

Rivera also challenged the district court's application of the terrorism enhancement.  In affirming

the district court, the Seventh Circuit did not discuss the fact of the variance or in any way

challenge the extent of the district court's downward variance to 24 and 36 months, but

necessarily found the defendants to be terrorists.

In so holding, the Seventh Circuit declared:[8]

> The terrorism enhancement at § 3A1.4 of the Guidelines applies if
> the crime "involved, or was intended to promote, a federal crime of
> terrorism."  U.S.S.G. § 3A1.4.  The Guidelines define "federal
> crime of terrorism" with reference to 18 U.S.C. § 2332b(g)(5).
> That subsection has two requirements.  The first is that the crime
> was "calculated to influence or affect the conduct of government
> by intimidation or coercion, or to retaliate against government
> conduct."  18 U.S.C. § 2332b(g)(5)(A).  There is no question about
> that here.  The second is that the crime is among those listed in §
> 2332b(g)(5)(B); among the crimes listed there is the destruction of
> government property under § 1361.  And that is what Rivera
> pleaded guilty to.
>
> ... A defendant who does not meet the requirements for a
> conviction under § 2332b(g)(5) may still fall under the provisions
> of § 2332b(g)(5) and in turn warrant the terrorism enhancement.
> *United States v. Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005).  We
> have previously noted that § 3A1.4 applies "where a defendant is
> convicted of a federal crime of terrorism as defined by 18 U.S.C. §
> 2332b(g)(5)(B) *or where* the district court finds that the purpose or
> intent of the defendant's substantive offense of conviction or
> relevant conduct was to promote a federal crime of terrorism as
> defined by § 2332b(g)(5)(B)."  *United States v. Hale*, 448 F.3d
> 971, 988 (7th Cir. 2006) (quoting *Arnaout*, 431 F.3d at 1001)
> (internal alterations omitted); *see also United States v. Ashqar*, 582
> F.3d 819 (7th Cir. 2009) (upholding the enhancement applying to a
> defendant convicted of criminal contempt).  On this point the Fifth

---

[8] *Christianson*, 586 F.3d at 539-40.

(1:12 CR 238)

Circuit has observed that of the crimes listed in § 2332b(g)(5)

> none ... has an element requiring conduct transcending national boundaries. All that section 3A1.4 requires for an upward adjustment to apply is that one of the enumerated offenses was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

> *United States v. Harris*, 434 F.3d 767, 773 (5th Cir. 2005) (quotation omitted). Thus, we reject Rivera's argument that for the terrorism enhancement under § 3A1.4 to apply, his conduct must meet the jurisdictional element to § 2332b, *i.e.*, that the crime transcend national boundaries. 18 U.S.C. § 2332b(b).

The recent decision of the Sixth Circuit in the case of *U.S. v. Amawi, et al.*, 695 F.3d 457 (6th Cir. 2012) deserves comment. The lengthy trial below was presided over by fellow colleague, Judge James C. Carr of the Northern District of Ohio (Case No. 3:06 CR 719). The defendant was convicted of conspiracy to kill and maim persons outside the United States, conspiracy to provide material support to terrorists in furtherance of the killing of U.S. nationals, and distributing information regarding manufacture of explosives, destructive devices and weapons of mass destruction.

Judge Carr conducted a two-day sentencing hearing for defendant Amawi. The transcript of the sentencing hearing at page 273 reflects the following commentary by Judge Carr:[9]

> And so I think the record shows that much – many, but by no means all of the acts giving rise to the <u>conviction involve to some extent Mr. Griffin's involvement, promotion, or encouragement, and facilitation</u>. That doesn't make him responsible for what the defendants did and desired to do. Nonetheless, I don't think it's appropriate to ignore that situation and circumstance. <u>He encouraged [sic] to recruit others to get involved</u>, to seek out

---

[9] Case No. 3:06 CR 719, ECF 1044.

(1:12 CR 238)

> suitable sites, to think in terms of the training, the kind of training they have.  He was with them the three times they went out to the shooting range.  <u>So I think he played off their expression of interest, desire, and intent, and did the things he did, all of which were entirely legal</u>.  There's nothing at all that prevents the government from engaging in the kind of investigation that it did and doing it in the way that it did.... .  (Emphasis added.)[10]

In sentencing Amawi, Judge Carr denied the government's request for a life sentence and varied downward to a sentence of 240 months.  Defendants appealed their sentences on various grounds and the government cross-appealed on the grounds that the sentences imposed were both procedurally and substantively unreasonable.  The Sixth Circuit affirmed Judge Carr's sentences, including the downward variance to 240 months for Amawi, on both procedural and substantive grounds.  *Amawi*, 695 F.3d at 486-490.

*U.S. v. Stewart, et al*., 590 F.3d 93 (2$^{d}$ Cir. 2009) is worthy of consideration.[11]  The trial involved three defendants who were convicted on charges related to conspiracy to kill persons in foreign countries and conspiracy to defraud the United States.  The lengthy opinion discusses the district court's decision to not apply the terrorism enhancement to the co-defendant Yousry.  In explaining the denial of the application of the terrorism enhancement to Yousry, the district court explained:[12]

---

[10] The reference to Mr. Griffin is to the primary government witness against the defendant and as to the fact that Griffin helped facilitate the criminal conduct of the defendant, but did not engage in entrapment.

[11] The government's sentencing memorandum, ECF 184 at page 7, takes sharp disagreement with *U.S. v. Stewart*, and argues that a conspirator is responsible for the acts of his or her co-conspirators if those acts were foreseeable and in furtherance of the conspiracy.  The Court agrees with the government's criticism.

[12] *Stewart,* 590 F.3d at 138.

23

(1:12 CR 238)

> This is a motivational requirement and focuses on the defendant's purpose. The government has conceded the lack of motivation or purpose and has failed to show that the defendant's offenses were calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government action.

In further explanation of the district court's limited sentence of 20 months for the co-defendant Yousry, the circuit court declared as follows:[13]

> The government maintains that any motivational requirement imposed by the terrorism enhancement can be imputed to Yousry from his co-conspirators' relevant conduct under section 1B1.3(a) of the Guidelines. It provides, in relevant part:
>
>> [A]djustment in Chapter three [including the terrorism enhancement] shall be determined on the basis of the following:
>>
>> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>>
>> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable act and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense...
>
> U.S.S.G. § 1B1.3(a). The government asserts that it was reasonably foreseeable to Yousry that his co-conspirators were acting in a manner "calculated to influence or affect the conduct of government," so that the requirement of section 2332b(g)(5)(A) is satisfied as to him.

---

[13] *Stewart*, 590 F.3d at 138-90.

(1:12 CR 238)

But sections 1B1.3(a)(1)(A) and (B) apply to "acts and omissions," while, as noted above, section 2332b(g)(5)(A) describes a motivational requirement, a "specific intent." *Chandia*, 514 F.3d at 376. We cannot conflate Yousry's acts with his co-defendants' mental states. As one member of this Court has pointed out, "We have never regarded *mens rea* as an 'act' of the defendant for purposes of the relevant conduct guideline, nor should we." *United States v. McHugh*, 122 F.3d 153, 158 (2d Cir. 1997) (Newman, J., concurring). "Section 1B1.3(a)(1)(A) permits selection of an enhanced guideline for 'acts' committed by the defendant.... The natural meaning of 'act' connotes conduct, and the meaning of the guideline should not be strained to include state of mind." *Id.* Here, too, the terrorism enhancement's motivational requirement, as incorporated by reference to section 2332b(g)(5)(A), is not an "act" or "omission" under section 1B1.3(a)(1)(B). The enhancement is therefore not applicable.

*U.S. v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004) represents a case where it was determined that the offense of conspiring to destroy buildings affecting interstate commerce by means of fire or explosives was a felony involving or intending to promote the federal crime of terrorism, thus justifying the addition of the terrorism enhancement.

In so deciding, the circuit court opined:[14]

Rather, it is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered. Moreover, there was substantial evidence supporting the district court's finding that the object of Mandhai's crime was to influence or affect government conduct, or to retaliate against past government action. Mandhai's goal was to bomb and disable public utilities in the hopes that power outages would lead to civil strife and upheaval on the streets of Miami. He planned to demand the release of Muslim prisoners and changes in the government's foreign policy after the bombings. He sought weapons, money, and explosives, and he staked out targets to bomb. The record supports the district court's ruling that Mandhai intended to promote a federal crime of terrorism. The enhancement was

---

[14] *Mandhai*, 375 F.3d at 1248.

(1:12 CR 238)

        proper even though the record reflects that Mandhai lacked both the means and the ability to carry out his defined activity without assistance that was not present.

*U.S. v. McDavid*, 396 Fed. Appx. 365 (9th Cir. 2010) is an unpublished decision, but it is also instructive.  McDavid, the defendant, was convicted of conspiring to bomb one or more targets, including a federal facility for tree genetics, a federal dam and fish hatchery and cell phone towers.  Affirming the terrorism enhancement, the appellate court observed:[15]

        Additionally, McDavid contends the terrorism enhancement is inapplicable because the conspirators' intention to affect or retaliate against the government was not established by the evidence.  *See* 18 U.S.C. § 2332b(g)(5)(A) (defining crime of terrorism); U.S.S.G. § 3A1.1 (enhancement for crime of terrorism).  To the contrary, at sentencing, the district court noted that the group had discussed a number of different ways to disrupt the government and the economy, that the object of the conspiracy was federal facilities, and that McDavid had clearly expressed his goals and objectives in disrupting the government.  Viewing the evidence as a whole, these findings supporting the enhancement were not clearly erroneous.

### VII.  The Government Established by a Preponderance of the Evidence that the Terrorism Enhancement Should Apply to Wright, Baxter and Stevens

        This issue has been fully briefed by counsel.  *See* ECF 181 for defendant Baxter's memorandum in opposition, ECF 182 for defendant Wright's opposition, and ECF 183 for defendant Stevens' opposition.

        Counsel for the government has filed a extensive sentencing memorandum and argues for the application of the terrorism enhancement to each of the three defendants.  ECF 184.

---

[15] *McDavid*, 396 Fed. Appx. at 372.

(1:12 CR 238)

As indicated in *U.S. v. Assi*, *supra*, the two elements the government must establish are that one the offense must be "calculated to influence or affect the conduct of the government by intimidation or coercion..." and be a violation of a list of enumerated statutes set forth in 18 U.S.C. § 2332b(g)(5)(B).

After considering the evidence as hereinbefore described, as well as the previously cited appellate decisions, the Court finds by a preponderance of the evidence[16] that the conduct of the three defendants Wright, Baxter and Stevens, individually and collectively, was "calculated to influence and affect the conduct of the government."  As a consequence, the Court finds that the terrorism enhancement applies to each of the three defendants.

In so finding, the Court finds that the government brief with respect to Douglas Wright at pages 11 through 13 clearly establishes, by a preponderance of the evidence, that the terrorism enhancement applies to Douglas Wright.  The Court further finds, by a preponderance of the evidence, that the conduct of the defendant Brandon Baxter as described in pages 13 through 16 establishes proof of the terrorism enhancement as to Baxter.  Finally, the Court finds, by a preponderance of the evidence that the conduct of defendant Stevens as described in pages 16 through 18 of the government's brief establishes by a preponderance of the evidence that the terrorism enhancement applies to the defendant Connor Stevens.

---

[16] The Court has determined that "preponderance of the evidence" is the correct burden of proof to apply in determining whether the terrorism enhancement applies.  *U.S. v. Layne*, 324 F.3d 464, 473 (6th Cir. 2003) (citing *U.S. v. Graham*, 275 F.3d at 517 n. 19); *see also U.S. v. Chandia*, 675 F.3d 329, 338-40 (4th Cir. 2012).

27

(1:12 CR 238)

VIII.  Unresolved  Additional Objections<br/>By The Government And The Three Defendants<br/>To The Presentence Investigation Reports

The first objection is submitted by the government objecting to the factual summary set forth in the presentence investigation reports.  The Court finds that its factual summary as set forth in this opinion is accurate.  The Court appreciates the efforts of the government and the authors of the presentence reports to assist the Court in setting forth an accurate, factual summary.

The second unresolved objection by the government with respect to the presentence report relates providing the opinions of  Steven Oluic with respect to the damage to the bridge that would have taken place by use of the C-4 explosives provided to the defendants by the government's cooperating witness.  The government argues that the potential destructive force of the C-4 explosives is not relevant nor should it be considered by the Court.

The Court will receive any additional reports the government chooses to provide with respect to the apparent explosive potential of the C-4 provided.  However, the Court notes that the explosive potential of the C-4 provided to the defendants may be relevant with respect to the Court's consideration of possible variances.

The third objection submitted by defense counsel is an objection to the application of the terrorism enhancement   The Court has addressed and resolved the issue of the inclusion of the terrorism enhancement as set forth herein in Section VII.

The fourth objection is by the government arguing that the defendant Baxter should be assessed an additional three levels pursuant to U.S.S.G. § 3B1.1(b) for being a manager, but not

28

(1:12 CR 238)

a leader of the criminal activity with five or more participants.  The government argues that the defendant Baxter spearheaded many discussions of targets, and in fact, kept the group focused on governmental targets and targets that carried political significant and meaning.  Baxter was the first person to suggest a bridge as a target and was also the first to offer to serve as a decoy during protests to confuse and obstruct law enforcement's response to any explosions.  Baxter was present at the initial meeting with the undercover agent to discuss purchasing explosives and tactical gear and also at the actual purchase and delivery of the IED's.

The probation officer recommended a denial of an upward adjustment under the provisions of 3B1.1 for a role in the offense.  The Court notes that the presentence report of the defendant Wright provides for an upward adjustment of two levels for a leader in the criminal activity under the provisions of 3B1.1(c).  The Court adopts the recommendation of the probation department and denies an upward adjustment for role in the offense as to the defendant Baxter in light of the fact that such an upward adjustment has been provided with respect to the defendant Wright.  The Court finds that defendant Wright was clearly the leader in the activities of the five defendants.

The fifth unresolved objection is the government's objection to granting any downward adjustment for any of the defendants for acceptance of responsibility because the post-plea declarations of each defendant disavowing any intention to harm people despite their direct actions on the night of and leading up to April 30, 2012 negates any allowance for any of the defendants for acceptance of responsibility.

(1:12 CR 238)

In response, the probation officer continued to recommend that each defendant be awarded a two-level reduction for acceptance of responsibility because each defendant pled guilty and provided a statement indicating acceptance of responsibility.

The Court denies the government's objections.

The sixth unresolved objection is brought by defendant Connor Stevens.  He argues that he should be awarded a role reduction pursuant to U.S.S.G. § 3B1.2 as a minimal participant, or at least, a minor participant for reasons in sum that the defendant Stevens was not present for the first several weeks in the conversations regarding the conspiracy, was a reluctant participant, and was not involved in the procurement of the C-4 devices.  The probation officer has recommended a denial of the adjustment downward for a minor or minimal participant.  The Court disagrees and will award Stevens a three-level downward adjustment as a minor participant.

IX.  The Proposed Offense Level and Criminal History
Calculation for Each of the Three Defendants,
Wright, Baxter and Stevens

The major sentencing issue in this case is whether the terrorism enhancement applies to one or more of the defendants.  The Court has answered that issue in the affirmative.  However, a separate guideline guidance calculation in which the terrorism enhancement is not applied results in a diminished offense level calculation.  To bring into focus the importance of the terrorism enhancement, the Court has considered the two alternatives with respect to the calculation of the guideline offense level.

(1:12 CR 238)

The first alternative is to the effect that the terrorism enhancement applies to each of the defendants. The second alternative, as hereinafter outlined, is based on the proposition that the terrorism enhancement does not apply to any of the three individual defendants.

The first alternative follows:

The presentence investigation report for defendant Wright fixes the offense level at 36 and the criminal history category at VI calling for a sentencing range of 324 to 405 months. The calculation of the offense level includes a two-level upward enhancement for role in the offense.[17]

The presentence investigation report for defendant Brandon Baxter sets the offense level at 262 to 327 months. Baxter is determined to have a criminal history level VI, thus producing a sentencing range of 262 to 327 months.

As the Court has assigned a three-level downward adjustment in calculating the offense level of Connor Stevens due to the finding that he was a minor participant, the adjusted offense level for Connor Stevens is 31 and with a criminal history category VI producing a sentencing range of 188 to 235 months.

---

[17] Paragraph 38 of Douglas Wright's presentence investigation report states in part as follows:

> Douglas Wright served as the leader of the group, he brought Baxter, Stevens, Hayne and Stafford in and initiated contact with the CHS in November. Wright was the person who first mentioned making plastic explosives because he thought buying them was too expensive, and ultimately he came up with the idea to blow up the (continued) Route 82 bridge afer doing independent research on targets.

31

(1:12 CR 238)

The Court now turns to an explanation of the determination of the base offense level.  In the calculation of the base offense level for each of the three defendants, Wright, Baxter and Stevens, the presentence report calculates the base offense level as 24.  The government objects and proposes a base offense level of 42.  The issue with respect to the base offense level is critical to the determination of the base offense level for the three defendants, Wright, Baxter and Stevens.

The Baxter presentence report at paragraph 37 under the title of Victim-Related Adjustments adds an additional 12 levels with the following explanation:

> **Victim-Related Adjustments:** Pursuant to U.S.S.G. § 3A1.1, 12 levels are added, or if less than level 32, increase to level 32.  The case involved terrorism.  In this case the defendant's [sic] pled guilty to 18 U.S.C. § 2332a (2 counts) and 18 U.S.C. § 844(i).  Both statutes are expressly recognized by the Terrorism Enhancement Provision as qualifying offenses.  In this case, the defendants identified potential targets that if carried out would have intimidated or retaliated against the government under the Occupy Movement banner.  The group had talked about how taking out a bridge would have forced the government to put security on basically every bridge.  This demonstrates how the group was attempting to intimidate the government.  The group also discussed blowing up the Turning Bridge, a train, an armored car, the Fusion center and lastly, the Justice Center.

In the Connor Stevens presentence report includes an identical Victim-Related Adjustment adding 12 levels to the offense level.  The Douglas Wright presentence report also adds an identical "Victim-Related Adjustment."

All three presentence reports contain an identical paragraph rejecting the government's position that the applicable sentencing guideline is U.S.S.G. § 2M6.1 with the following explanation:

32

(1:12 CR 238)

> Counts 1 and 2: (**A**) U.S.S.G. § 2A6.1 is titled "Threatening or Harassing Communication; Hoaxes; False Liens" and is not applicable in this case. (**B**) U.S.S.G. § 2M6.1 is titled "Unlawful Activity Involving Nuclear Material, Weapons, or Facilities, Biological Agents, Toxins, or Delivery Systems, Chemical Weapons, or Other Weapons of Mass Destruction; Attempt or Conspiracy." The following is contained in Application Note 1 of that guidelines, "Definitions. - For purposes of this guideline: ... 'Weapon of mass destruction' has the meaning given that term in 18 U.S.C. § 2332a(c)(2)(B), (C), and (D)." Since the weapon of mass destruction involved in the instant offense does not meet any of the definitions found in 18 U.S.C. § 2332a(c)(2)(B), (C), and (D), U.S.S.G. § 2M6.1 is not applicable in this case. (**C**) U.S.S.G. § 2K1.4 is titled "arson; Property Damage by Use of Explosives," and it is the applicable guideline for Counts 1 and 2. According to U.S.S.G. § 1B1.2(a), "[i]f the offense involved a conspiracy, attempt, or solicitation, refer to § 2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense." U.S.S.G. § 2X1.1(a) was considered, however, it would result in the same Base offense Level as § 2K1.4.

The base offense level for Wright and Stevens is also calculated as base offense level of 24 and adds an additional 12 levels for Victim-Related Adjustments.

As earlier indicated and in conclusion, the total offense level for the defendant Connor Stevens is 31, for the defendant Brandon Baxter 34, and for the defendant Douglas Wright 36.

The Court adopts the presentence report with respect to the calculation of the offense levels for the three defendants, and rejects the government's claim that U.S.S.G. § 2M6.1 is applicable. The Court finds that the total offense level for the defendant Connor Stevens is 31. The Court finds that the adjusted offense level for the defendant Brandon Baxter is 34. The Court finds that the total offense level for the defendant Douglas Wright is 36.

(1:12 CR 238)

The Court further finds that the criminal history category for each of the defendants is VI. Consequently, the sentencing range for the defendant Connor Stevens is 262 to 327 months.  As to defendant Brandon Baxter, the guideline evaluation with a total offense level of 34 and a criminal history category VI is 262 to 327 months.  The offense level for defendant Douglas Wright is 36 with a criminal history category VI calling for a sentencing range of 324 to 405 months.

Now the Court addresses the guideline calculation and offense level if, in fact, the terrorism enhancement does not apply.

First as to defendant Douglas L. Wright. The Court finds the base offense level to be 24, plus an additional two levels for role in the offense resulting in an adjusted offense level of 26, less two, for acceptance of responsibility, for a total offense level of 24.  The criminal history category for Douglas L. Wright is calculated beginning at paragraph 47 of the presentence report and concludes at paragraph 51 of the presentence report with a resulting determination that the defendant's criminal history category, in the absence of the terrorism enhancement, is III, calling for a sentencing range of 63 to 78 months.

As for Brandon Baxter, the Court finds the base offense level is 24, and with a reduction of two levels for acceptance of responsibility, places the offense level at 22.  Baxter's criminal history includes two points for juvenile adjudications as set forth in paragraphs 46 and 47 of the presentence report.  The first juvenile adjudication is dated March 30, 2009 when the defendant was 16 and found guilty of inciting to violence, F3, aggravated riot F-4, unlawful restraining (M3) and disorderly conduct (MM).  The defendant was committed to the Ohio Department of

34

(1:12 CR 238)

Youth Services for a minimum of six months and was eventually placed on community control

on June 1, 2010.  The second juvenile adjudication for the defendant Baxter was for the offense

of attempted felonious assault committed on September 26, 2009 at the age of 17.  Paragraph 47

of the presentence report indicates that the defendant Baxter stabbed his stepfather.

Consequently, the criminal history category for the defendant Baxter is II and with the offense

level of 22, calls for a sentencing range of 46 to 57 months, but with the understanding that the

mandatory minimum sentence is 60 months.

The calculation with respect to the defendant Connor C. Stevens follows.  Initially, the

Court finds that the total offense level is 19 giving the defendant a two-level reduction for

acceptance of responsibility and a three-level downward adjustment for a minimal role in the

offense.

The defendant's criminal history begins with consideration of his juvenile adjudications,

one of which resulted in criminal history point one for a juvenile conviction of theft on October

25, 2009 at the age of 17.  The summary of the offense indicates that the defendant did

knowingly obtain or exert control over a cape, said value of $10.00 with the purpose to deprive

the owner, Walmart, of said property.  The defendant has no adult convictions resulting in no

criminal history points.  Consequently, the criminal history category for the defendant Connor C.

Stevens is category I.  With an offense level of 19 and a criminal history category I, the

sentencing range is 30 to 37 months, but with the caveat that the mandatory-minimum sentence

is five years or 60 months.

(1:12 CR 238)

The Court has included these alternative sentencing ranges in the event that a higher court subsequently determines that the terrorism enhancement does not apply, and also for further consideration in the context of possible downward variances.

<u>X.  CONCLUSION</u>

Final sentencing memoranda are due by noon on November 16, 2012.  Defendants Douglas L. Wright, Brandon L. Baxter, and Connor C. Stevens will be sentenced at 9:00 a.m. on November 20, 2012 in Courtroom 442 as previously scheduled.

IT IS SO ORDERED.


 November 14, 2012                                 */s/ David D. Dowd, Jr.*
Date                                                         David D. Dowd, Jr.
                                                                 U.S. District Judge

36