IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:12 CR 238-001 |
| | : | |
| Plaintiff, | : | JUDGE DAVID D. DOWD , JR. |
| | : | |
| v. | : | |
| | : | **DEFENDANT WRIGHT'S** |
| | : | **SENTENCING MEMORANDUM** |
| | : | |
| DOUGLAS L. WRIGHT, | : | |
| Defendant. | : | |

Defendant **DOUGLAS L. WRIGHT**, by and through counsel, respectfully submits the instant Sentencing Memorandum in anticipation of the sentencing hearing scheduled before this Court on November 20, 2012, at 9:00 a.m.

 

Respectfully submitted,

s/Anthony J. Vegh
Anthony J. Vegh
526 Superior Ave., East
The Leader Building, Suite 720
Cleveland, Ohio 44114-1401
P (216) 566-1424
F (216) 566-1468
tvegh@vecchio-vegh.com
(Ohio Bar Reg No. 0039603)

Counsel for Defendant Wright

1

**MEMORANDUM**

**Sentencing Standards**

Section 3553(a) of Title 18 is the guiding statute for sentencing courts in the advent of the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005). Through Booker, the Supreme Court redefined the role of the Sentencing Guidelines, as promulgated by the United States Sentencing Commission. Post-Booker, the Guidelines constitute one of the factors sentencing courts must consider in determining a sentence that is "sufficient but not greater than necessary" to achieve the statutory goals of sentencing. This standard requires courts to impose sentences that (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

In consideration of the purposes of this statute, this Court must fashion a sentence which considers all the following factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to further the purposes set forth above; (3) the kinds of sentences available; (4) the kinds of sentence and sentencing range applicable to the defendant as set by the United States Sentencing Guidelines as well as any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need to provide restitution to any victims of the

offense.  18 U.S.C. § 3553(a).  Each of the sentencing considerations are addressed separately *infra.*

The totality of these factors promotes a "holistic" sentence which may result in sentences lower than those previously calculated under a mandatory guideline scheme because the possible sentencing range no longer prohibits courts from considering any specific factor.  Another crucial statutory sentencing authority is 18 U.S.C. § 3661, entitled "Use of information for sentencing."  This provision also emphasizes a holistic sentencing approach, stating:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C § 3661.  In addition to the above-referenced statutory authority, Section 5H of the Guidelines contains a host of previously-prohibited factors sentencing courts may now consider. These include the age of the defendant, education and vocational skills, mental and emotional conditions, physical condition, employment record, family ties and responsibilities, role in the offense, etc.

Although the recommended Guideline range must be taken into account, the Court must follow the "parsimony provision" of 18 U.S.C. § 3553(a), which is the "overarching" command of the statute. Kimbrough v. United States, 552 U.S. 85 (2007). That provision provides: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Moreover, when reaching an appropriate sentence, district courts "may not presume that the Guidelines range is reasonable." Gall v. United States, 552 U.S. 38 (2007). Rather, the court "must make an individualized assessment based on the facts presented. If [the court] decides that an outside the Guidelines sentence is warranted, [the court] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id.; see

also Rita v. United States, 551 U.S. 338 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

The Supreme Court rejects, however, the notion that "extraordinary circumstances [are required] to justify a sentence outside the Guidelines range" and rejects "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." Gall, 552 U.S. at 47. Further, the sentencing court may consider whether "the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, U.S.S.G. § 5K2.0, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." Rita, 551 U.S. at 351; see also Cunningham v. California, 549 U.S. 270 (2007) (stating that judges are no longer tied to the sentencing range indicated in the Guidelines, but are obliged to "take account of" that range along with the sentencing goals Congress enumerated in 18 U.S.C § 3553(a)).

In Kimbrough v. United States, 552 U.S. 85 (2007), the United States Supreme Court reaffirmed the framework for Courts fashioning a defendant's sentence. Under Kimbrough, sentencing courts must treat the Guidelines as the "starting point and the initial benchmark" when formulating a reasonable sentence. Kimbrough, 552 U.S. at 108. However, the Guidelines are instead merely the starting point for a nuanced assessment of each individual case and the appropriateness of the Guidelines sentence must be judged against the other factors in 18 U.S.C. § 3553(a). Id. at 101.  While the statute still requires a court to give respectful consideration to the Guidelines, the court must tailor the sentence in light of the other factors in § 3553(a) as well. Booker, 543 U.S. at 245-246. Therefore, in order to properly fashion a sentence under 18 U.S.C. § 3553(a), each of the seven sentencing factors must be addressed in turn.

Application of the terrorist enhancement does not in any way lessen this Court's discretion, under Booker, to vary and sentence Defendant Wright to a non-guideline sentence. "When a

Guidelines recommendation has such dramatic consequences and yet covers a multitude of sins [as the Terrorism Enhancement does], unusually broad sentencing discretion in the district court is essential. Indeed, it must be so to comply with the Supreme Court's remedial holding in *United States v. Booker*."

The Sixth Circuit has previously declined to apply a complete twelve level upward departure under § 3A1.4. In <u>United States v. Mason</u>, 410 Fed. Appx. 881 (6th Cir. 2010), the sentencing court applied only a six level upward departure. The Court of Appeals recognized the validity of the district court's approach, stating that "the district court recognized that the terrorism adjustment did not provide gradation and then, rather than increasing Mason's offense level by twelve and sentencing her at offense level thirty-eight, decided to sentence her at offense level thirty-two." *Id.*, at 887. The Sixth Circuit recognized that the increase to level VI for criminal history was also unjustified in some cases, and noted that increasing Mason's criminal history level from category I to category VI overstated her criminal history. *Id.* at 884-85. S*ee also,* <u>United States v. Amawi</u>, 695 F.3d 457, 486-490 (6th Cir. 2012) (affirming the district court's decision granting a downward variance to defendants facing the terrorism enhancement and potential life sentences) as procedurally and substantively reasonable). Once applied, the totality of these factors evidence that Mr. Wright's matter is outside the heartland of cases and warrants a variance.

**Application Of 18 U.S.C. §3553(a) Sentencing Factors**

18 U.S.C. §3553(a) mandates that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The specific sections of §3553(a) as applied to Mr. Wright's case are addressed in detail below.

**Section 3553 (a) (1)**

**Nature of the Offense**

Initially, Wright references and incorporates as if fully rewritten herein, Defendants' Joint Statement of Facts (Doc.#171) which describes the nature of the offense in detail.

What brought Doug Wright to Cleveland? He arrived here after hitching a ride from Chicago. What is undeniable true is that before his arrival to Cleveland and to the Occupy Cleveland Movement, Doug Wright was not on the FBI"s radar; he was not being investigated by the FBI. (Detention Hearing Transcript, SA Taylor, pp.74-75). His involvement with this matter began the day he met the CHS.

As discussed below, there are numerous facts unique to Douglas Wright and this case that take this matter outside the "heartland" of similar cases. To do so, the role of the CHS must be discussed and analyzed just as the Wright's role must be analyzed. In so doing, Defendant is not suggesting he was entrapped. He was not. More importantly, Doug Wright accepted responsibility for his actions in the most meaningful way possible; he (knowing he would most certainly face a prison sentence of some duration) pleaded guilty to all counts of the Indictment.

Wright's Poverty and Economic Dependence On The CHS

At the time Wright met the CHS, he was essentially homeless and penniless. After meeting Wright at the Occupy Cleveland Protests, the CHS e-mailed Wright: "I may be able to help you with phone and job situation. I am really interested in getting involved." FBI SA Ryan Taylor testified at the evidentiary hearing that (at the time this e-mail was sent) the CHS was **not** authorized to offer Wright a job. The CHS did so anyway. The CHS's offer for work began Wright's economic dependence on the CHS. As this Court knows, Wright eventually was employed by the CHS and also lived at on the CHS' properties. Wright's economic dependence on the CHS was not limited to money. Doug Wright had no vehicle and no drivers' license. He did not even own a bicycle until he began to work for the CHS. The CHS picked up and transported Wright (and his co-defendants who were also impoverished) to work and to every single meeting including meetings with the "arms dealer"; recon trips; and to the Route 82 Bridge the night of April 30th. [1] More importantly, the CHS' ability to control and influence Wright due to Wright's economic dependence on the CHS cannot be over looked or minimized. Human nature tells us otherwise. This economic dependence is unique to this case and necessarily suggests variance.

Wright's Initial Refusals To Acquire C-4

Undeniably, Wright eventually agreed to acquire C-4 from the "arms dealer". Yet his decision to do so (much like the decision to target the Route 82 Bridge instead of a cargo ship) is nuanced. In mid to late March, Wright and his co-defendants were interested in acquiring

---

[1] Baxter also testified that the CHS gave Wright marijuana on one occasion. And (as indicated in the PSR), Wright has profound substance abuse problems.

defensive equipment to use in demonstrations. For instance, on March 22, 2012, the CHS asks Wright if he wants the CHS to "reach out" to a source for "explosives or grenades". Wright tells him "Tear gas." Later in the same conversation, the CHS asks Wright if Wright wants "guns". Wright tells him he definitely wants "gas masks" and "vests". And then Wright tells the CHS, "We don't want anything lethal though." On March 23, 2012, the CHS asks Wright if he wants the CHS to obtain "construction grade explosives". Wright puts off the CHS telling him that they need to get together with Brandon Baxter and "talk". On March 28, 2012, Wright, Baxter, and the CHS meet with the "arms dealer". Baxter and Wright talk about their interest in buying gas masks, batons, and bullet proof vests. Wright declines the "arms dealer's" offer to purchase C-4. On March 30, 2012, the "arms dealer" phones Wright and asks him if "needs anything else." By "anything else" the agent means explosives. Wright again declines. It was not until April 1st that Wright agreed to acquire the C-4 from the "arms dealer". These are not the words or thought process of a cold blooded 'terrorist".

Wright's Concern Over Civilian Causalities

The Government has pointed out in various filings that Doug Wright expressed disregard for potential harm to civilians his actions might cause. His words were reckless and he regrets them. Yet, he also expressed his concern over harm to civilians in many instances.

For instance, on March 28, 2012, Baxter and Wright express their concern that using an explosive on a heavily traveled bridge "…would kill a bunch of people." The men then describe various aspects of the bridge. Baxter suggests placing the explosives "in the middle of the night that way nobody will notice, nobody gets hurt…" Wright agrees telling the CHS "you don't

8

want collateral damage.".  Wright and Baxter talk about diverting people from the bridge "…and make sure nobody's about to drive on it (ui) about hit it."

On April 19, 2012 (after the Route 82 Bridge was selected as a target), the CHS suggests to Wright and Stevens that they can target either "…the bridge or the dam." (Transcript, p. 133) Wright rejected the CHS's suggestion of targeting the dam, explaining to him that destruction of the dam could destroy people's houses and hurt people.

The CHS's Involvement

As discussed above, the CHS's involvement (and to what extent) in this matter is another factor that is essential to determine within the calculus of variance.  The CHS was (and is) a career criminal, master manipulator and con man. He committed crimes during his involvement with Doug Wright and his co-defendants. The Defendants' Joint Memorandum (Doc.#172) regarding the CHS is a detailed report on his criminal record and background.   Consider the following:

On March 28, 2011, the CHS, Wright and Brandon Baxter are driving in the CHS's vehicle over the I-480 Bridge when the CHS broaches the subject of blowing up a bridge.  This was the first mention of targeting a "bridge".

On March 30, 2012, Wright and Baxter tell the CHS that they have found gas masks and batons cheaper on line than from the "arms dealer". The CHS, sensing the men are waffling on buying the C-4, he tells them that if they don't buy from his "dude" that there will be an "issue". He then tells them "I think we should get it [meaning the C-4]." On April 7, 2012, the CHS (after Baxter expresses concern about targeting a bridge) tells Wright, Baxter, and Stevens that "we are the hook for it", again meaning the C-4.

On April 10, 2012, Defendant Wright broached the idea of targeting a cargo ship. Baxter and Stevens agreed to go along with this preposterous idea. That is until April 19, 2012, when Wright expresses his concern to the CHS that there may be no shipping traffic near the part of the Cuyahoga River where he was considering placing his C-4 (in a floating cooler of some sort). The CHS tells Wright that they need a contingency plan and eventually suggests targeting the Route 82 Bridge.

There are numerous other instances detailed in the Defendants' Joint Statement of Facts where in the CHS takes charge; not just in the acquisition of a target but in the minute details of same.

Wright's Ignorance As To C-4

Nowhere in the transcripts or FBI reports is there any evidence that Wright (or any of his co-defendants) ever acquired any basic understanding of how to use C-4 or acquired any knowledge of its capabilities as an explosive. FBI SA Ryan Taylor confirmed this fact at the evidentiary hearing. Certainly Wright believed that the C-4 that he would eventually place at the base of the Rt. 82 Bridge would cause some sort of damage. However, Dr. Oluic's report (where he opines that the amount of C-4 used by Wright and his co-defendants could only cause superficial damage to the bridge column) highlights Wright's ignorance and naiveté as to the use of C-4. Moreover, the PSR cites Dr. Oluic's report as grounds for variance. [PSR, p.20,¶94] Wright's ignorance of C-4 is grounds for variance because it shows he is not a trained "terrorist" who is knowledgeable in the use of explosives.

**Characteristics Of Doug Wright**

Douglas Lee Wright was born on May 31, 1985, in Hiawassee, Georgia, to Sharon Wright. He was raised by her in Gainesville, Georgia. He had fair childhood although his mother worked to support the family. Because she was a single mother, Wright cared for his siblings at a young age becasue his mother could not afford a baby sitter. Mr. Wright's biological father was a non-factor in his life. He grew up without a father. Mr. Wright was physically abused by two of his mother's boyfriends because they did not want him around. At age 16 or 17, Mr. Wright left home. He lived with his aunt in Wichita, Kansas. After a while, he went to the Job Corps in Utah. Mr. Wright traveled the country on freight trains. He would find work and "bum" money wherever he could to survive. He was also able to get food stamps and wore warm clothes in the winter months. Mr. Wright did not communicate with his family for years until approximately 2 years ago right before Thanksgiving. He spent the holidays with his family before leaving again. Mr. Wright has good relationship with the following family members: Sharon Wright, mother, age 45, resides in Gainesville, Georgia; Michael Dunnell, half brother, age 17, resides in Gainesville, Georgia; Austin Dunnell, half brother, age 15, resides in Gainesville, Georgia; and Rebekah Dunnell, half sister, age 20, resides in Gainesville, Georgia.. [PSR, p.14,¶56]

Mr. Wright has Hepatitis C and cirrhosis of the liver. He is not presently seeing a doctor, nor is he taking any prescribed medications for these conditions. [PSR, p.15,¶59]   Cirrhosis of the liver is an incurable disease.

At the age of 12 or 13, Mr. Wright was examined by Dr. Guy in Gainesville, Georgia, after being a patient in the psychiatric ward of a hospital. His mother recalled her son seeing Dr. Guy, but could not recall for what. Mr. Wright attempted suicide at ages 18 or 19 when he tried

to slash his wrist on one occasion and tried to jump in front of an Amtrak train on another occasion. He did this because he felt hopeless and was on drugs and alcohol at the time. Mr. Wright indicated to the author of the PSR that he thought he had taken psychotropic medications in the past, but he could not remember which ones. [PSR, p.15,¶60]

Mr. Wright has a lengthy history of substance abuse. He began using marijuana at age 11 for the first time. Initially, he did not use marijuana very often; however, his use increased to daily for a period of time. Mr. Wright last used marijuana on April 30, 2012 (the day he placed what he believed to be C-4 at the Route 82 Bridge). Mr. Wright began using cocaine on average of about one time per month. However, cocaine is not his drug of choice. Mr. Wright began using heroin for the first time at age 18. He used the drug daily for almost four years. He stopped using heroin upon his release from a jail facility. Mr. Wright used methamphetamine every day for a three to four year stretch, and then he stopped using on his own. He also used acid, mushrooms and a horse tranquilizer called Kettermine, or "Special K," once or twice. During the entire conspiracy, Mr. Wright was consuming K-2 (a potent marijuana like substitute), marijuana, and alcohol on a daily basis. Mr. Wright first began drinking alcohol at age 11 or 12 when he stole beer from his mother's boyfriend. He began drinking again when he was traveling the country, and he would drink all day, every day. He advised that alcohol was his drug of choice and that he last drank on April 30, 2012. Mr. Wright has never received any substance abuse treatment.

Mr. Wright attended North Hall High School in Gainesville, Georgia, where he withdrew from the tenth grade to travel the country. While in school, he was in classes for those with behavioral problems. In approximately 2003, Mr. Wright earned his GED from the Job Corps.in Clearfield, Utah. [PSR, p.16,¶62]

**Character Letters**

Counsel for Mr. Wright provided the Court with several letters in support of Doug. Some of the people who wrote got to know Doug during his brief time in Cleveland. This mother writes that Doug befriended her son at Occupy Cleveland. She describes Doug as "…a person who puts others needs in front of his own." She describes how Doug "…made a point to look out for the safety of everyone at the Occupy encampment." Her husband writes that Doug "kept a watchful eye on my son on Public Square and when Doug finished his duties, he would help out my son with his." And describes how he is grateful to Doug "… in helping my son and keeping him safe during that time." He also praises Doug for looking after Connor Stevens in jail fearing that Stevens "…is easy prey for prison bullies." Significantly, this man describes Doug as a formerly poor, lost child who was picked on by bullies who found the courage to stand up for others.

Another person who got to know Doug at Occupy describes him as "[a] hard worker willing to do what it takes to better the community." Finally, a supporter writes how she met Doug at a charity called "Food Not Bombs" that serves food to the hungry weekly. She tells how Doug was polite and helpful. She also worked with Doug at Occupy Cleveland and describes Doug as a person who "…stayed up late to watch over the campsite while others were sleeping."

**(A) - The Need For The Sentence Imposed To Reflect The Seriousness Of The Offense. To Promote Respect For The Law, And To Provide Just Punishment For The Offense.**

When this Court imposes sentence, Defendant asks this Court to consider the following issues which go to the heart of a fair and just sentence, and will promote respect for the law. In

asking the Court to impose a non-guideline sentence (a variance), we ask this Court to consider all of the Section 3553(a) factors and impose a sentence sufficient, but not greater than necessary. We ask this Court to consider that while Doug Wright did acquire what he believed to be C-4 and place it at the base of the Route 82 Bridge, there are many facts which mitigate his actions. And although Wright believed his actions would damage the Route 82 Bride in some manner, the reality is that the amount of C-4 Wright was using would have only caused minimal damage to the bridge. Thus, the seriousness of this offense, and the need to deter others, pales in comparison to other terrorist cases where actual action was taken. This was never going to be a case where people were injured and property damaged. We respectfully ask this Court to consider a prison sentence far below 324 to 405 months.

**(B) – The Need For The Sentence Imposed To Reflect Adequate Deterrence To Criminal Conduct.**

To suggest that the only way to deter others from committing this type of crime is to incarcerate Doug Wright for essentially the rest of his life defies common sense, the manner in which other courts have treated similarly situated defendants and violates the directives of 3553(a). Whatever sentence this Court's deems "sufficient, but not greater than necessary" will be a significant sentence in terms of its length. And thereby provide the general deterrence required by the section.

**(C) – The Need For The Sentence Imposed To Protect The Public From Further Crimes Of The Defendant.**

Defendant submits that a downward variance from his guideline sentencing range (which still imposes a significant prison sentence) will deter Mr. Wright from re-offending.  The involvement of the CHS, Wright's lack of knowledge as to C-4 and other factors present in this matter all indicate that this case was a unique event.  Wright will not re-offend especially considering that he will also be subject to a long period of supervised release after his sentence is completed.

**(D) – The Need For The Sentence Imposed To Provide The Defendant With Needed Vocational Training, Medical Care, Or Other Correctional Treatment In The Most Effective Manner.**

Most importantly, Defendant would benefit from sentence that gives him hope and that includes drug counseling and meaningful treatment for the chronic diseases he suffers from, Hepatitis C and cirrhosis of the liver.

**Section 3553 (a) (2) (3) and (4) – The Kinds Of Sentences Available/Application of The Sentencing Guidelines**

In its Memorandum Opinion and Order (Doc. #187) the Court calculated Mr. Wright guideline range with application of the terrorist enhancement (U.S.S.G. §3A1.4) as follows, "…offense level 36 and the criminal history VI calling for a sentencing range of 324 to 405 months." *Id*. at 31.  Without the enhancement, Mr. Wright's is total offense level 24, a Criminal History Category III "…for a sentencing range of 63 to 78 months."  *Id*. at 34.  Thus, full application of the terrorist enhancement quintuples Mr. Wright sentence.

**Section 3553 (a) (2) (5) – Pertinent Policy Statement Of The Sentencing Commission**

Defendant is unaware of any specific Guideline policy statements the impact his sentence.

**Section 3553 (a) (6) The Need To Avoid Unwarranted Sentencing Disparities**

Defendant submits, for the reasons argued herein, that variance from his Guideline range resulting in a sentence below 324 months will not result in an un-warranted disparity as to other defendants convicted of this offense. Indeed, the Court has cited to some of them in its Memorandum and Opinion Order (Doc.#187). *See* U.S. v. Christianson, 586 F.3d. 532 (7th Cir. 2009) (an Earth Liberation Front case); United States v. Amawi, 695 F.3d 457, 486-490 (6th Cir. 2012); United States v. Stewart, 590 F.3d 93 (2nd Cir. 2009).

Another case that supports Defendant Wright's request for variance also involved the Earth Liberation Front "ELF".  In 2007, ten (10) members of the ELF  (an eco-terrorist group) were sentenced by Judge Aiken (District of Oregon) in United States v. Thurston et *al.,* Case No. 06CR60069. **Members of this terrorist cell were responsible for more than 20 arsons from 1996 through 2001 in five Western states that did $40 million in damage.**  Some of the defendants received the "terrorist enhancement" others did not.  The following is a brief description of the defendants who did receive the terrorist enhancement and their respective sentences:

Suzanne Savoie, 29, was sentenced to 51 months in prison and received a terrorism enhancement for her involvement in a tree farm arson. She also served as a lookout during a January 2001 firebombing of a lumber mill in Glendale, Oregon. .

Daniel McGowen, 31, was sentenced to seven years in prison and received the terrorism enhancement for his role in the tree farm arson.

Stanislas Meyerhoff, 30, received the terrorist enhancement and was sentenced to 13 years in prison.  Meyerhoff taught the other defendants how to make timers for incendiary devices

16

Joyanna Zachler, 29, and Nathan Block, 26, the youngest of the defendants, were each sentenced to 7 years and 8 months in prison.  They both received the terrorism enhancement

Kevin Tubbs, 37, was sentenced to 12 years 7 months in prison and given the terrorism enhancement for charges related to several of the arsons in Oregon and Washington.

The defendants in this case caused millions of dollars in damage. They had the working knowledge of how to use incendiary devices, the means to acquire them, and set fire after fire over a 5 year period until they were caught.  Their actions collectively put the civilian population and firefighters at real peril.  Yet all of them receive far shorter sentences than advocated by the Government in this matter.

**Section 3553 (a) (7) The Need To Provide Restitution To Any Victims Of The Offense,**

There is no restitution in this case.  PSR p. 19, ¶88.

**CONCLUSION**

Doug Wright was only in Cleveland for a short period of time before this matter began. In that short period of time, he managed to impress a few people as the type of person who cared about others.  He impressed these people enough that these everyday folks took the time out of their busy days to write this Court on his behalf.  Their concerns and appreciation for Doug show that he is a person that can be rehabilitated and serve a useful life. Doug Wright is asking for a chance to make that future a possibility. For the foregoing reasons, Mr. Wright requests that this Court consider a downward variance resulting in a prison sentence far below 324 to 405 months.

Respectfully submitted,

s/Anthony J. Vegh
Anthony J. Vegh
526 Superior Ave., East
The Leader Building, Suite 720
Cleveland, Ohio 44114-1401
P (216) 566-1424
F (216) 566-1468

(Ohio Bar Reg No. 0039603)

Counsel for Defendant

18

## CERTIFICATE OF SERVICE

      A copy of the foregoing was electronically served on this 16th day of November, 2012.  Notice of this filing will be sent to all counsel indicated on the electronic receipt by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system

<em>s/Anthony J. Vegh</em>